Filed 8/20/14  P. v. Daley CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B248219 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA074833) |
| v. | |
| EVA DALEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Arthur Jean, Jr., Judge.  Affirmed.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Jonathan J. Kline and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Eva Daley appeals her judgment of conviction of second degree murder (Pen. Code,[1] § 187, subd. (a)).  Daley raises the following arguments on appeal:  (1) the evidence was insufficient to support her conviction; (2) the trial court erred in instructing the jury on the natural and probable consequences theory of murder as an aider and abettor; and (3) the trial court erred in failing to instruct the jury on voluntary and involuntary manslaughter as lesser included offenses of murder.  We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.    The Charges

In a single-count information, the Los Angeles County District Attorney charged Daley and Heriberto Garcia with the murder of Jose Cano (§ 187, subd. (a)).  The information alleged that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)).  Daley's case was tried to a jury for a third time in March 2013.[2]

### II.    The Prosecution Evidence

#### A.    The Stabbing Death of Cano

Jose Cano was a member of a Long Beach area gang known as the "Latin Thugs" or "LTs."  Before joining the LTs, Cano spent time with a rival gang known as the "Loco Marijuana Smokers" or "LMS."  The two gangs were primarily comprised of teenagers. Daley's son, Mauricio Rivera, was a member of the LMS, and was friends with Cano before Cano joined the rival LTs.  In December 2006, six months prior to Cano's death,

---

[1]    All further statutory references are to the Penal Code.

[2]    At the first trial, Daley and Garcia were both found guilty of second degree murder.  In a prior opinion, we affirmed the judgment as to Garcia, but reversed the judgment as to Daley on the ground that the trial court erred in instructing the jury on the natural and probable consequences doctrine with former CALCRIM No. 403.  (*People v. Garcia* (Aug. 2, 2010, B211909) [nonpub. opn.].)  At Daley's second trial, the jury was deadlocked and a mistrial was declared.

2

Rivera was stabbed.  A witness told the police that she saw Rivera talking to Cano shortly before the stabbing.

On June 25, 2007, the day of Cano's death, Daley was residing with Rivera and her two other children in an apartment complex in Long Beach.  Carlos Jimenez, a fellow member of the LMS, also lived in the apartment complex.  On that afternoon, Rivera and Jimenez were involved in an altercation with some rival LT gang members in an alley behind the complex.  During the altercation, Daley and Jimenez's mother ran into the alley and remained there talking to their sons after the LTs left.  Following that incident, a group of LTs drove by the apartment complex and threw gang signs from their vehicle.  Later that evening, a group of at least seven LMS members gathered outside the apartment complex and then got into Daley's white Chevy Tahoe.  The group included Rivera, Jimenez, Garcia, Alejandro Flores, Jakkia Ross, Juan Bautista, and Edwin Moran.  As Daley was driving the teenagers in her vehicle, they saw a group of LT gang members, including Cano, standing near 14th Street and Pine Avenue in LT territory.  The group in Daley's Tahoe exited the vehicle and ran toward the rival LTs.

Carlos Lopez was walking his dog near 14th Street and Pine Avenue when he saw a white Chevy Tahoe stop near an alley.  He testified that six to eight males exited the passenger side of the vehicle and ran through the alley out of Lopez' sight.  After a few minutes, a woman walked hurriedly to the Tahoe, opened the driver's side door, and shouted, "Come on, come on, let's go, let's go."  Less than a minute later, the passengers ran back through the alley and reentered the vehicle.  Lopez heard one of them say, "We slashed him good."  The woman drove the Tahoe away quickly.

Shortly before the assault, Tracie Mendez was standing with Cano and some other friends near the intersection of 14th Street and Pine Avenue.  She lived in the area and knew both LMS and LT members.  Mendez reluctantly testified that she saw a group of 10 to 15 males running toward her and her friends.  The group, which included Garcia, Rivera, and Jimenez, chased Cano as he ran toward a nearby park.  One of them yelled out "LMS."  The group then surrounded Cano and began beating him.  After Cano fell to

3

the ground, the group took off running in different directions. Mendez approached Cano and saw that he was bleeding.

Three of the LMS members involved in the assault – Jimenez, Ross, and Flores – were called to testify at trial. The prosecution also introduced portions of the audio recordings of their prior interviews with the police. Jimenez testified that, on June 25, 2007, he and Rivera had an argument with some LT members outside their apartment complex, and the LTs threatened Jimenez's mother. Later that evening, Jimenez, Rivera, and four other LMS members gathered outside the complex and got into Daley's SUV. As Daley was driving them to a store, they saw a group of LTs standing near 14th Street and Pine Avenue, and jumped out of the vehicle. Jimenez chased one of the LTs, but did not catch him. After the group returned to her vehicle, Daley angrily asked them, "What the fuck are you doing?" In his interview with the police, Jimenez stated that he and some fellow LMS members went to fight the LTs because they had disrespected his mother. Jimenez fought with one LT while the others in his group beat Cano. When they returned to the car, Garcia told the group that he had stabbed someone.

Ross testified that, prior to the assault, Daley drove her SUV to his house to pick him up. Rivera, Garcia, Jimenez, and two other LMS members were already in the vehicle. Daley later stopped the SUV near 14th Street and Pine Avenue and Ross jumped out. Ross got into a fight with one LT while other members of his group beat up Cano. They then returned to Daley's vehicle. In his police interview, Ross stated that Rivera had told him that the LTs had come to Rivera's house and disrespected his mother by "talking smack" and possibly slapping her. Ross and the other LMS gang members decided that they were going to "rumble" with the LTs and left in Daley's SUV. As Daley was driving the group, some of them repeatedly said, "[T]hey disrespected my house, they disrespected my mom." Daley parked the SUV on Pine Avenue and the group got out. Jimenez and either Rivera or Garcia were carrying mini wooden bats. Ross yelled out "LMS" as they chased after some LT gang members. Garcia, Rivera, and three others caught Cano and brutally beat him. The group then ran back to Daley's SUV. Once inside the vehicle, Garcia said, "[D]amn, I stabbed him, I stabbed him."

4

There was a lot of blood on Garcia's shirt and pants. Ross admitted to the police that when he went to rumble with the LTs, he knew there was a good chance that someone was going to get hurt.

Alejandro Flores testified that, prior to the assault, he was told by a fellow LMS member that the LTs had come by Rivera's and Jimenez's houses and had disrespected them. Flores and six other LMS members, including Rivera, Jimenez, and Garcia, got into Daley's SUV so that she could take them to the store. Flores was carrying a two-foot long wooden stick. According to Flores, Daley was driving the group, but "she didn't really know what was going on" and "didn't know what was going to happen." While riding in the SUV, the group saw Cano and some other LTs, and ran out of the vehicle to chase them. After the group returned to the vehicle, Daley asked them what had happened and they told her not to worry about it. In his police interview, Flores told the officers that the fight occurred because LT gang members had been to LMS territory earlier that day. A group of LMS members gathered near Rivera's home and Daley told them, "[L]et's go." She then drove the group to LT territory, parked her vehicle, and told everyone to get out before the police came. Daley stayed inside the vehicle while everyone else went to fight the LTs. Flores told the police that he knew there was a good chance that someone would get seriously hurt in the fight.

Cano died from multiple stab wounds. He sustained a total of nine stab wounds to various parts of his body, including one fatal stab wound to his chest that punctured his heart. There was no evidence that he suffered any other trauma. During a subsequent search of Daley's Chevy Tahoe, multiple blood stains were found inside the vehicle. Garcia's DNA was matched to the blood stains found on a passenger seat belt and seat cushion, and Cano's DNA was matched to the blood stain found on the front passenger headrest.

While in custody, Daley made several recorded telephone calls from the Long Beach City Jail to Rivera's girlfriend, Guadalupe Lopez. In a June 28, 2007 call, Daley asked Lopez to talk to the other boys or their mothers and tell them "the truth as I am telling you." Daley then said that she "had nothing to do with anything there," that "they

5

were not there," and that "they don't know anything in regards to what happened." Daley also advised Lopez to say that Rivera was at a neighbor's house. In a second call that day, Daley asked Lopez to tell her what Rivera had said to the police so that she could make sure their stories matched. When told that Daley's other son had said "the opposite" about where Rivera was, Daley responded that he had no credibility because he was a child. Daley said that she told Rivera that he should not say anything other than that he was at the house. She also said that her problem was that her truck had been recognized at the crime scene. In a third call that day, Daley asked Lopez if the police were talking to the neighbors. Lopez told Daley that the neighbors had said they did not know anything. Daley responded, "[V]ery good. As long as they stick to that, okay." Daley said that she was going to tell the police that the others had arrived at her house so that she could give them a ride and she did not know what happened afterward. In a June 30, 2007 call, Daley told Lopez that Rivera needed to be careful about what he said and that he could not say that Daley "instigated them." Daley said that Rivera should tell the police that he went to get dropped off, that someone said to "divert that way" when Daley least expected it, and that they exited the car while it was still running. Daley also said that she had told the police that she did not want them to think that Rivera had stabbed Cano in revenge because Cano previously had stabbed Rivera.

### B. The Gang Expert Testimony

Officer Chris Zamora testified as an expert on criminal street gangs. He described the LMS as a small Hispanic gang in the Long Beach area, whose main rival was the LTs. As younger gangs, both the LMS and the LTs aligned themselves with older and larger criminal street gangs. The two gangs were in an ongoing battle for the same geographic territory in Long Beach. Officer Zamora identified Rivera, Garcia, Jimenez, Ross, Flores, and Moran as active members of the LMS. He identified Cano as a member of the LTs. Officer Zamora opined that, based on the facts of the case, the stabbing of Cano would have been committed for the benefit of the LMS gang. He further opined

6

that Daley's participation in the crime also would have benefited the gang because she played an important role as the getaway driver.

### III.    The Defense Evidence

Daley testified on her own behalf. In 2007, she was the single mother of three minor children, including Rivera, who was then 14 years old. Daley worked two part-time jobs, which allowed her to be home in the morning to drive her children to school. She often gave Rivera's friends, including Garcia, Jimenez, and Flores, a ride to school. Daley had seen graffiti in her neighborhood, but had not heard of the LMS and did not know that her son was a gang member. Approximately six months before Cano's stabbing, Rivera began having behavior problems at both home and school, and was arrested for possession of a knife. Daley tried to help Rivera by seeking counseling for him and arranging his transfer to a new school.

On June 25, 2007, at around 6:00 p.m., Daley heard yelling in the alley near her apartment. Daley and Rivera went outside and saw a group of people walking away. The group was cursing at Daley's neighbors and throwing road flares in their direction, but they did not say or do anything to Daley. Garcia and Jimenez were present in the alley and exchanged profanities with the members of the group. A short time later, at Rivera's request, Daley agreed to pick up a few of his friends, including Bautista, Moran, and Ross, and bring them back to the apartment complex. When she returned home with these friends, she saw Garcia, Jimenez, and Flores standing outside. At approximately 8:00 p.m., a police helicopter flew overhead and Rivera and his friends ran into the apartment. Rivera asked Daley to drive his friends home and she agreed.

Daley was driving the group in her Chevy Tahoe when someone in the back of the vehicle suddenly told her to stop. As Daley started to decelerate, the group of youths, including Rivera, jumped out of the Tahoe and ran down the street. Daley did not know what was happening and was worried about her son. She stopped the Tahoe and briefly walked around looking for Rivera. She then got back into the vehicle and started the engine. At that point, Rivera returned. Daley was reprimanding Rivera for jumping out

7

of the car when the other members of his group came back. Daley yelled at the group and asked them what they were thinking. She then drove them to Garcia's house. Daley never saw any weapons or blood inside her vehicle, and she never heard anyone say that a person had been stabbed. She learned of the stabbing the following day from other parents in the neighborhood. In her telephone calls from jail, Daley was concerned about Rivera because she did not want him to be blamed for something that he did not do.

Daley presented four character witnesses who testified that she was an honest person with no history of violence or gang involvement. The witnesses also testified that Daley was a good mother who treated her children well.

## IV.     Verdict and Sentencing

Daley was found guilty of second degree murder. The jury found the gang enhancement allegation to be not true. Following the verdict, the trial court sentenced Daley to 15 years to life in state prison.

## DISCUSSION

## I.     Sufficiency of the Evidence on the Second Degree Murder Conviction

Daley first challenges the sufficiency of the evidence supporting her conviction for second degree murder. She specifically contends that the prosecution failed to meet its burden of proving that Daley had the requisite knowledge of Garcia's criminal purpose, and that murder was a natural and probable consequence of the assault that occurred in this case. We conclude that Daley's conviction was supported by substantial evidence.

### A.     Applicable Law

To assess a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict - i.e., evidence that is reasonable, credible, and of solid value - such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review

8

the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Murder is the unlawful killing of a human being "with malice aforethought." (§ 187, subd. (a).) "Malice may be either express or implied. [Citation.] Express malice is an intent to kill. . . . Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses. [Citation.]" (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) "A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder. [Citation.] 'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 942.)

"[A]n aider and abettor's liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.] Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault. [Citation.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)

9

To convict a defendant under the natural and probable consequences doctrine, the jury "must find that the defendant, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime[;] . . . (4) the defendant's confederate committed an offense other than the target crime; and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." (*People v. Prettyman* (1996) 14 Cal.4th 248, 262, fn. omitted.) "Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonable foreseeable consequence of the act aided and abetted.' [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*).) "A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury. [Citations.]" (*Ibid.*)

Murder can be a natural and probable consequence of a simple assault under certain circumstances, including a gang attack. (*Medina*, *supra*, 46 Cal.4th at p. 916.) In *Medina*, the defendants and the victim were members of rival gangs. A verbal challenge by the defendants led to a fistfight. After the fistfight, one defendant shot and killed the victim as the victim was driving away. The California Supreme Court concluded that the evidence was sufficient to support the murder convictions of the other defendants because "a rational trier of fact could have concluded that the shooting death of the victim was a reasonably foreseeable consequence of the assault." (*Ibid.*) The Court reasoned that "the ultimate factual question is one of reasonable foreseeability, to be evaluated under *all* the factual circumstances of the case." (*Id.* at p. 927.) Under the facts of the case, "the jury could reasonably have found that a person in defendants' position (i.e., a gang member) would have or should have known that retaliation was likely to occur and that escalation of the confrontation to a deadly level was reasonably foreseeable as [the victim] was retreating from the scene." (*Id*. at pp. 922-923.)

10

The Supreme Court also noted that "in the gang context, it was not necessary for there to have been a prior discussion of or agreement to a shooting, or for a gang member to have known a fellow gang member was in fact armed." (*Medina*, *supra*, 46 Cal.4th at p. 924.) Instead, "[t]he issue is 'whether, under all of the circumstances presented, a reasonable person in the defendant's position would have *or should have known* that the [shooting] was a reasonably foreseeable consequence of the act aided and abetted by the defendant.'" (*Id*. at p. 927; see also *People v. Gonzales* (2001) 87 Cal.App.4th 1, 10 [fatal shooting during fistfight between rival gangs was natural and probable consequence of fight]; *People v. Montes* (1999) 74 Cal.App.4th 1050, 1055-1056 [shooting of rival gang member during retreat from fight was natural and probable consequence of assault despite defendant's lack of knowledge that associate was armed]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1375-1376 [defendant's punching of victim during gang-related fight foreseeably resulted in fatal shooting of victim by fellow gang member].)

### B.    Substantial Evidence Supported Daley's Conviction

When viewed in the light most favorable to the verdict, the evidence was sufficient to support Daley's conviction. The prosecution presented evidence that Daley's son, Rivera, and his friends were active members of the LMS gang and that Cano was a member of the rival LT gang. Six months before the deadly assault on Cano, Rivera was stabbed. On the day of Cano's stabbing, a group of LT gang members came "looking for trouble" at the apartment complex where Daley, Rivera, and another LMS member, Jimenez, lived. An argument broke out in the alley between the LTs and Rivera and Jimenez. Daley and other residents were present in the alley as the LTs yelled profanities at them and threw road flares in their direction. After the incident, Daley and Jimenez's mother remained in the alley for a period of time talking to their sons. Later that evening, the LTs drove by the apartment complex again, yelling and throwing gang signs from their vehicle. Rivera and Jimenez were angry about the incident and felt the LTs had disrespected them and their mothers.

11

The evidence further showed that, following the incident, a group of at least seven LMS members, including Rivera, Jimenez, and Garcia, gathered at the apartment complex. Daley herself admitted, that at her son's request, she went to pick up some of these individuals and brought them back to her home. After gathering outside the apartment complex, the group decided that they were going to "rumble" with the LTs and Daley told them, "Let's go." The group got into Daley's SUV and she drove them into LT territory. As Daley was driving, Rivera and Jimenez repeatedly told the others, "They disrespected my house, they disrespected my mom." Once they arrived in LT territory, Daley parked the SUV near an alley and instructed everyone to exit the vehicle before the police came. The group then ran down the alley toward the rival LTs while Daley waited near her vehicle. Two members of the group were carrying small bats, and at least one member, Garcia, was armed with a knife.

The prosecution also presented evidence that, after approaching the group of LT gang members, one LMS member yelled out "LMS." When Cano and his fellow LTs tried to flee, Garcia and the members of his group gave chase. The group surrounded Cano and began beating him, and during the attack, Garcia stabbed Cano multiple times with the knife. As the group ran back to Daley's SUV, Daley yelled out to them, "Come one, come on, let's go, let's go." One member of the group said, "We slashed him good." Once the group was back in her vehicle, Daley drove away quickly.

Daley argues the evidence was insufficient to support a finding that she aided and abetted the assault on Cano because the prosecution failed to prove that she had the requisite knowledge of Garcia's unlawful purpose. There was substantial evidence, however, that Daley knew that Garcia and his fellow LMS members were angry at the LTs for disrespecting them and Daley, and that they decided to "rumble" with the LTs that night. With this knowledge, Daley drove Garcia and at least six other LMS members into LT territory, parked her SUV and ordered everyone to exit before the police came, waited by her vehicle as the group ran toward Cano and his fellow LTs, told the group to hurry when they returned from assaulting Cano, and then drove the group away from the scene of the crime. From this evidence, the jury reasonably could have found that Daley

12

had knowledge of Garcia's criminal purpose in assaulting a rival LT and that Daley intended to aid and abet the commission of the assault by driving the group into LT territory and then acting as their getaway driver immediately after the attack.

Daley also asserts the evidence was insufficient to support a finding that murder was a natural and probable consequence of the assault on Cano under the circumstances of the case. Daley reasons that, even though she may have exercised poor judgment in driving a group of teenage boys to a fistfight, it was not reasonably foreseeable that the fight would end in a homicide. We disagree. Although Daley denied any knowledge of the LMS or her son's gang involvement at trial, it ultimately was up to the jury to weigh her credibility as a witness and to decide whether to accept her claim of ignorance as true. The jury reasonably could have inferred that Daley knew the intended fight was between two rival gangs. She was present in the alley earlier that day when a group of LT gang members disrespected her son and his fellow LMS members, and threw flares at Daley and her neighbors. She was also present in her vehicle while driving at least seven LMS members into LT territory as the group discussed their plan to "rumble" with the LTs. While there was no evidence that Daley knew Garcia was armed with a knife, there was evidence that two members of the group were carrying small bats and another one was carrying a two-foot long stick. As the Supreme Court observed in *Medina*, "escalating violence is a foreseeable consequence to be expected in gang confrontations," and "prior knowledge that a fellow gang member is armed is not necessary to support a defendant's murder conviction as an aider and abettor." (*Medina*, *supra*, 46 Cal.4th at pp. 926, 921; see also *People v. Montes*, *supra*, 74 Cal.App.4th at p. 1056 ["[g]iven the great potential for escalating violence during gang confrontations, it is immaterial whether [defendant] specifically knew [fellow gang member] had a gun"].) Based on the totality of the record, there was substantial evidence that a reasonable person in Daley's position either would have or should have known that the fatal stabbing of Cano was a foreseeable consequence of the planned assault by a group of rival gang members. The evidence was therefore sufficient to support Daley's conviction for second degree murder.

13

## II.    Jury Instruction on the Natural and Probable Consequences Doctrine

Daley next contends that the trial court erred in instructing the jury on the natural and probable consequences doctrine with a modified version of CALJIC No. 3.02. In particular, Daley claims that the instruction erroneously omitted the requirement of a nexus between the target offense that she intended to aid and abet and the non-target offense committed by a co-principal. We conclude that the trial court did not err in instructing the jury with CALJIC No. 3.02, and that even if the modified instruction was not entirely clear, there is no reasonable likelihood that the jury misunderstood or misapplied the instruction in reaching its verdict.[3]

### A.    Relevant Instructions

The trial court instructed the jury on the general principles of aiding and abetting liability with CALJIC Nos. 3.00 and 3.01. The trial court also instructed the jury on the natural and probable consequences doctrine with the following modified version of CALJIC No. 3.02: "One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted. [¶] In order to find the defendant guilty of the crime of murder under this theory, you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime of assault or assault

---

[3]    The Attorney General contends that Daley forfeited her claim of error on appeal by failing to request a modification of the challenged instruction in the trial court. We have repeatedly rejected this forfeiture argument, which appears to have been made more reflexively than reflectively. An appellate court may review any claim of instructional error that affects a defendant's substantial rights irrespective of whether there was an objection in the trial court. (§ 1259 ["appellate court may also review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"]; *People v. Hudson* (2006) 38 Cal.4th 1002, 1012; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.) Whether the defendant's substantial rights were affected, however, can only be determined by deciding if the instruction as given was flawed and, if so, whether the error was prejudicial. Therefore, we necessarily must review the merits of Daley's claim that there was instructional error.

14

with a deadly weapon was committed; [¶] 2. That the defendant aided and abetted that crime; [¶] 3. That a co-principal in that crime committed the crime of murder; and [¶] 4. The crime of murder was a natural and probable consequences of the commission of the crime of assault or assault with a deadly weapon. [¶] In determining whether a consequence is 'natural and probable,' you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A 'natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen. [¶] You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crime of murder was a natural and probable consequence of the commission of that target crime."

## B. Applicable Law

In a criminal case, the trial court must instruct the jury on the general principles of law that are relevant to the issues raised by the evidence and are necessary for the jury's understanding of the case. (*People v. Burney* (2009) 47 Cal.4th 203, 246.) An instructional error that improperly describes or omits an element of an offense is subject to the harmless error analysis set forth in *Chapman v. California* (1967) 386 U.S. 18, 24, and requires reversal unless "'it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."'" (*People v. Mayfield* (1997) 14 Cal.4th 668, 774; see also *People v. Lamas* (2007) 42 Cal.4th 516, 526.) However, "'not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. . . . "'[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" [Citation.] If the charge as a whole is ambiguous, the question is whether there is a "'reasonable

15

likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution.'" [Citation.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 192; see also *People v. Wallace* (2008) 44 Cal.4th 1032, 1075 ["'[f]or ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction'"]; *People v. Rogers* (2006) 39 Cal.4th 826, 873 [in reviewing ambiguous instructions, "we inquire whether the jury was 'reasonably likely' to have construed them in a manner that violates the defendant's rights"].)  The arguments of counsel must also be considered in "assessing the probable impact of the instruction on the jury." (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

As discussed, under the natural and probable consequences doctrine, "a person who aids and abets a confederate in the commission of a criminal act is liable not only for that crime (the target crime), but also for any other offense (nontarget crime) committed by the confederate as a 'natural and probable consequence' of the crime originally aided and abetted." (*People v. Prettyman*, *supra*, 14 Cal.4th at p. 254.)  Accordingly, to convict a defendant of a nontarget crime as an aider and abettor, the jury must find that the defendant assisted or encouraged the commission of a target crime, a confederate committed an offense other than the target crime, and the nontarget offense committed by the confederate was a natural and probable consequence of the target crime that the defendant assisted or encouraged.  (*Ibid*.)  "[T]he jury need not unanimously agree on the specific target crime that the defendant aided and abetted. . . . Nevertheless, at trial each juror must be convinced, beyond a reasonable doubt, that the defendant aided and abetted the commission of a *criminal act*, and that the offense actually committed was a natural and probable consequence of that act." (*Id*. at pp. 267-268.)  The instructions to the jury must accurately "describe[e] each step in this process [to] ensure proper application by the jury of the 'natural and probable consequences' doctrine." (*Id*. at p. 267.)

## C.    CALJIC No. 3.02, As Modified, Was Not Impermissibly Ambiguous

Daley argues that the modified version of CALJIC 3.02 given by the trial court was an erroneous statement of the law because it allowed the jury to find her guilty of

16

murder under an aiding and abetting theory of liability without finding that murder was a natural and probable consequence of the crime that she actually aided and abetted. Daley's argument focuses on the fourth element in the instruction which required a finding that "the crime of murder was a natural and probable consequence of the commission of the crime of assault or assault with a deadly weapon." Daley reasons that, while the first and second elements of the instruction required the jury to find that Daley aided and abetted a specific target crime (simple assault or assault with a deadly weapon), the fourth element erroneously failed to require a finding that murder was a natural and probable consequence of the specific target crime that Daley aided and abetted. Instead, the jury theoretically could have found that (1) Daley aided and abetted a simple assault, but not an assault with a deadly weapon, (2) a co-principal committed the crime of murder, and (3) murder was a natural and probable consequence of assault with a deadly weapon, but not of simple assault.

Daley is correct that, when read literally, the fourth element of CALJIC 3.02 as given by the trial court, if read alone, permitted the jury to convict her of murder even if it found that she aided and abetted only a simple assault and that murder was not a natural and probable consequence of that simple assault under the circumstances of the case. However, it is not reasonably likely that the jury misapplied the instruction in this manner. While the fourth element should have more precisely linked the two identified target crimes of assault and assault with a deadly weapon to the specific target crime that Daley aided and abetted, the remainder of the instruction accurately reflected the law on the natural and probable consequences doctrine. The instruction properly informed the jury that "[o]ne who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted." It also accurately stated that to find Daley guilty of the crime of murder under this theory, the jury had to be satisfied beyond a reasonable doubt that "[t]he crime of assault or assault with a deadly weapon was committed," that Daley "aided and abetted *that crime*," and that a "co-principal in *that crime* committed the crime of murder." In addition, the

17

final paragraph of the instruction clarified that the jury must "unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crime of murder was a natural and probable consequence of the commission of *that target crime*." Thus, when considered as a whole, the instruction adequately informed that jury that Daley could be convicted of Cano's murder under this theory only if murder was a natural and probable consequence of the target crime that Daley actually aided and abetted.

Moreover, contrary to Daley's claim on appeal, the closing arguments of counsel did not exacerbate the alleged error. The prosecutor never argued to the jury that Daley could be convicted of murder if she committed one target offense (simple assault) and murder was a natural and probable consequence of a different target offense (assault with a deadly weapon). Instead, the prosecutor correctly told the jury that "one who aids and abets another in the commission of one crime is not only guilty for that crime, but is also guilty of any other crime committed by a principal . . . which is a natural and probable consequence of the crime originally aided and abetted." The prosecutor then argued that, "in this case, the crime of murder was a natural and probable consequence of the assault." In his closing argument, defense counsel explained the natural and probable consequences doctrine as follows: "So the other complication of this case is that [a] person and I decide that we are going to go have a fist fight. We go to a certain place, and we have a fist fight. And what you have to decide is whether the probable consequence of that is going to be that murder is going to . . . be committed. Again, how many fights happen every day, everywhere? They don't all result in death. So it is possible, not probable. Not likely to occur." The closing arguments of both counsel made clear that if the jury found that a simple assault was the only crime that Daley aided and abetted, then she could not be found guilty of murder unless the jury also found that murder was a natural and probable consequence of that simple assault. Under these circumstances, the trial court did not err in giving the challenged instruction.

18

## III. Failure to Instruct on Voluntary Manslaughter

Daley asserts that the trial court erred in failing to instruct the jury sua sponte on voluntary manslaughter as a lesser included offense of murder. Daley specifically argues that an instruction on voluntary manslaughter was warranted because there was evidence that her role in the murder was the result of Cano stabbing her son six months earlier. We conclude that the evidence was insufficient to support a voluntary manslaughter instruction based on a heat of passion theory.

### A. Applicable Law

"[I]t is the [trial] 'court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged and shown by the evidence to have been committed.' [Citation.]" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826.) "Conversely, even on request, the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction' [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.) Substantial evidence "is not merely '*any* evidence … no matter how weak' [citation], but rather '"evidence from which a jury composed of  reasonable [persons] could … conclude[]"' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 664; see also *People v. Burney*, *supra*, 47 Cal.4th at p. 250 ["'[t]o justify a lesser included offense instruction, the evidence supporting the instruction must be substantial — that is, it must be evidence from which a jury . . . could conclude that the facts underlying the particular instruction exist'"].) "On appeal, we review independently whether the trial court erred in failing to instruct on a lesser included offense. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 181.)

Voluntary manslaughter is "the unlawful killing of a human being without malice . . . upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) "Heat of passion arises if, '"at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion

19

rather than from judgment."'  [Citation.]" (*People v. Beltran*, *supra*, 56 Cal.4th at p. 942.)  "'The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.]  The defendant must actually, subjectively, kill under the heat of passion,'" and the "'"heat of passion must be due to "sufficient provocation."'"" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1143-1144.)  "The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.  [Citations.]  The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.  [Citations.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59.)  "[P]rovocation sufficient to reduce murder to manslaughter need not occur instantaneously, but may occur over a period of time." (*People v. Wharton* (1991) 53 Cal.3d 522, 569.)  However, "'[i]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter. . . .'" (*People v. Beltran*, *supra*, at p. 951; see also *People v. Moye* (2009) 47 Cal.4th 537, 550.)

**B.     The Evidence Did Not Support a Voluntary Manslaughter Instruction**

Daley contends that there was sufficient provocation to support a voluntary manslaughter instruction because the prosecution introduced evidence that Daley's son may have been stabbed by Cano six months earlier.  However, as the Attorney General correctly points out, none of the participants in the deadly assault on Cano who testified at trial mentioned the prior stabbing as a motive for the assault.  In their interviews with the police, Jimenez, Ross, and Flores each stated that the reason for the assault was that LT gang members had been in LMS territory earlier that day and had disrespected some of the LMS members and their mothers, including Daley.  In her testimony, Daley denied any knowledge of who may have stabbed Rivera, and stated that she did not learn that Cano was a suspect in the stabbing until after her arrest.  Yet even assuming that Daley had a reasonable basis for believing Cano was involved in the prior incident, six months

20

had elapsed between the stabbing of Rivera and the killing of Cano, which was more than enough time for Daley's "passion to subside and reason to return." (*People v. Beltran*, *supra*, 56 Cal.4th at p. 951; see *People v. Moye*, *supra*, 47 Cal.4th at p. 551 [evidence of fight involving defendant and victim the evening before victim's deadly beating "did not itself constitute legally sufficient provocation to require instruction on . . . voluntary manslaughter"]; *People v. Pride* (1992) 3 Cal.4th 195, 250 [three-day gap between act of provocation and fatal stabbing of victim was "insufficient as a matter of law to arouse feelings of homicidal rage or passion in an ordinarily reasonable person"].) To warrant a voluntary manslaughter instruction, "the killing must be 'upon a sudden quarrel or heat of passion' [citation]; that is, 'suddenly as a response to the provocation, and not belatedly as revenge or punishment.'" (*People v. Daniels* (1991) 52 Cal.3d 815, 868.)

Daley nevertheless claims that the jury reasonably could have inferred that her heat of passion was reignited the day of Cano's assault when individuals associated with Cano yelled profanities and threw flares at Daley and her son in the alley near their home. This claim lacks merit. There was no evidence that Cano was one of the LTs who engaged in the conduct in the alley earlier that day. Cano simply happened to be standing on the street corner later that night when the LMS gang went into LT territory looking for a fight. In addition, Daley testified that the individuals involved in the altercation in the alley "were very far [away]" when they cursed at her and her fellow residents and threw flares in their direction. It is settled law that "[a] voluntary manslaughter instruction is not warranted where the act that allegedly provoked the killing was no more than taunting words, a technical battery, or slight touching." (*People v. Gutierrez*, *supra*, 45 Cal.4th at pp. 826, 827 [defendant's testimony that he told victim to "'[g]et off me, you f…ing bitch,' and that she 'cuss[ed] back at' him . . . did not constitute sufficient provocation for voluntary manslaughter"]; see also *People v. Manriquez* (2005) 37 Cal.4th 547, 586 [victim's actions in "call[ing] defendant a 'mother fucker' and . . . repeatedly asserting that if defendant had a weapon, he should take it out and use it . . . plainly were insufficient to cause an average person to become so inflamed as to lose reason and judgment"].) In this case, the conduct of Cano's associates in taunting Daley and her

21

son with flares and curse words was not sufficiently provocative to cause a reasonable person of average disposition to respond by killing Cano later that night. The trial court did not err in failing to give a voluntary manslaughter instruction.

## IV.     Failure to Instruct on Involuntary Manslaughter

Daley argues that the trial court also erred in failing to instruct the jury sua sponte on the lesser included offense of involuntary manslaughter. Daley asserts that an involuntary manslaughter instruction was required because the jury reasonably could have found that the fatal stabbing of Cano was an unintentional killing which occurred during the commission of a misdemeanor simple assault. We conclude that an involuntary manslaughter instruction was not supported by the evidence.

### A.     Applicable Law

As discussed, the trial court has a sua sponte duty to instruct on all theories of a lesser included offense which are supported by substantial evidence. (*People v. Burney*, *supra*, 47 Cal.4th at p. 250; *People v. Gutierrez*, *supra*, 45 Cal.4th at p. 826.) Involuntary manslaughter is a lesser included offense of murder. (*People v. Gutierrez*, *supra*, 28 Cal.4th at p. 1145.) Involuntary manslaughter is the unintentional killing of a human being without malice, "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192; subd. (b).) In addition to these statutory forms of involuntary manslaughter, "an unintentional homicide committed in the course of a noninherently dangerous felony may properly support a conviction of involuntary manslaughter, if that felony is committed without due caution and circumspection." (*People v. Burroughs* (1984) 35 Cal.3d 824, 835, disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89.)

All three forms of involuntary manslaughter require proof of criminal negligence – that is, "aggravated, culpable, gross, or reckless" conduct that creates a high risk of death or great bodily injury and that evidences a disregard for human life or an indifference to the consequences. (*People v. Penny* (1955) 44 Cal.2d 861, 879; see *People v. Butler*

22

(2010) 187 Cal.App.4th 998, 1007-1008.) In a homicide, where "a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence," and is guilty of involuntary manslaughter. (*People v. Evers* (1992) 10 Cal.App.4th 588, 596.) "By contrast where the defendant realizes and then acts in total disregard of the danger, the defendant is guilty of murder based on implied malice." (*Ibid.*) Additionally, "regardless of the manner an act of involuntary manslaughter is committed, the killing must be unintentional. [Citations.] If a killing is intentional, no involuntary manslaughter instructions may be given." (*People v. Dixon* (1995) 32 Cal.App.4th 1547, 1556; see also *People v. Hendricks* (1988) 44 Cal.3d 635, 643 ["'[i]nvoluntary manslaughter is . . . inherently an *unintentional* killing'"].)

## B.    The Evidence Did Not Support an Involuntary Manslaughter Instruction

Daley reasons that the trial court was required to instruct the jury on involuntary manslaughter because there was evidence that Cano's stabbing death resulted from an unintentional killing which occurred during the commission of a simple assault. Daley points out that one of the prosecution's theories of the case was that Daley was liable for murder because she aided and abetted the misdemeanor crime of simple assault and murder was a natural and probable consequence of that assault under the circumstances of the case. However, for purposes of instructing on lesser included offenses, "the trial court need not instruct on a particular necessarily included offense if the evidence is such that the aider and abettor, if guilty at all, is guilty of something beyond that lesser offense, i.e., if the evidence establishes that a greater offense was a reasonably foreseeable consequence of the criminal act originally contemplated, and no evidence suggests otherwise." (*People v. Woods* (1992) 8 Cal.App.4th 1570, 1593.) In this case, the evidence did not support an instruction on involuntary manslaughter.

The evidence at trial established that at least seven members of the LMS gang got into Daley's SUV with the intent to track down and fight the rival LTs in retaliation for an earlier altercation. Two members of the group were carrying small baseball bats, one member had a two-foot long wooden stick, and Garcia was armed with a knife. The

23

evidence further demonstrated that, during the assault, Cano was surrounded and beaten by a group of at least five LMS gang members and was stabbed multiple times. Cano suffered a total of nine stab wounds to various parts of his body, including one fatal stab wound to his heart. Immediately after the assault, as the group was getting back into Daley's car, one member of the group said, "[w]e slashed him good," and Garcia told the others, "I stabbed him, I stabbed him." Given that various members of the group in Daley's vehicle were armed with weapons when they went looking for a fight with a rival gang, the evidence could not reasonably support a finding that Cano was killed unintentionally during the commission of a misdemeanor or an otherwise lawful act done without due caution and circumspection.

Daley contends that a properly instructed jury could have found her guilty of involuntary manslaughter if it believed her testimony that she merely intended to drive her son's friends to their homes and had no knowledge of their criminal purpose. However, if the jury believed Daley's version of events, then Daley could not be found guilty of any homicide because she did not intend to aid or abet even a simple assault. On the other hand, based on the evidence presented at trial, if Daley aided or abetted any crime, she aided and abetted a group of at least seven gang members in their intentional use of violent force against a member of a rival gang. Under these circumstances, Daley cannot be said to have acted without realizing the risk of death or serious bodily injury involved in aiding and abetting the assault that occurred in this case. (*People v. Evers*, *supra*, 10 Cal.App.4th at p. 598 [intentional use of violent force against the victim, knowing the probable consequences of one's actions, precludes an instruction on involuntary manslaughter]; *People v. Huynh* (2002) 99 Cal.App.4th 662, 679 [defendant's plainly deliberate acts with knowledge that his confederate's acts could result in death precluded a finding of criminal negligence and an involuntary manslaughter instruction].) Because there was no substantial evidence to support a

finding that the killing of Cano was involuntary manslaughter, the trial court did not err in failing to give an involuntary manslaughter instruction.**4**

## V.     Alleged Sentencing Error

During sentencing, the trial court awarded Daley 2,920 days of presentence custody credit.  The abstract of judgment, however, awarded Daley only 2,120 days of credit.  While Daley argued that the abstract of judgment should be modified to match the trial court's oral pronouncement, she conceded that the abstract of judgment, rather than the trial court's oral pronouncement, correctly reflects the amount of presentence custody credits to which she was entitled.  Under these circumstances, the abstract of judgment requires no modification.

### DISPOSITION

The judgment is affirmed.


ZELON, J.

We concur:


PERLUSS, P. J.


SEGAL, J.**\***

---

**4**     In light of our conclusion that the evidence presented at trial did not support voluntary or involuntary manslaughter instructions, we need not address Daley's alternative claim that her trial counsel rendered ineffective assistance by failing to request those instructions.  (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 836.)

**\***     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.